# IN THE UNITED STATES BANKRUPTCY COURT
## FOR THE MIDDLE DISTRICT OF PENNSYLVANIA

| | | |
|---|---|---|
| IN RE: | * | **CHAPTER 7** |
| **ARTHUR L. WILLIAMS, II,** | * | |
| **Debtor** | * | **CASE NO: 1:09-bk-04781MDF** |
| | * | |
| **ROBERTA A. DeANGELIS,** | * | |
| **UNITED STATES TRUSTEE,** | * | |
| **Plaintiff** | * | |
| | * | |
| **v.** | * | **ADV. NO: 1:10-ap-00474MDF** |
| | * | |
| **ARTHUR L. WILLIAMS, II,** | * | |
| **Defendant** | * | |
| | * | |

## <u>OPINION</u>

Before the Court is a Complaint filed by Roberta A. DeAngelis, United States Trustee

(the "UST") to deny the discharge of Arthur L. Williams, II, ("Debtor") under 11 U.S.C.

§§ 727(a)(2)(A) and 727(a)(4)(A).[1]  For the reasons set forth below, Debtor's discharge will be

denied.

### I.  Procedural History

Debtor filed a Chapter 13 bankruptcy petition on June 22, 2009. He elected to convert his

case to Chapter 7 on October 6, 2010, before he was able to confirm a plan.[2]  On December 20,

2010, the UST filed a Complaint to deny Debtor a discharge based on § 727(a)(4).  In her

Complaint, the UST alleged that Debtor had intentionally failed to disclose all income he had

---

[1]This Court has jurisdiction pursuant to 28 U.S.C. §§157 and 1334.  This matter is core
pursuant to 28 U.S.C. §157(b)(2)(J).  This Opinion constitutes findings of fact and conclusions
of law made pursuant to Federal Rule of Bankruptcy Procedure 7052.

[2]Debtor decided not to pursue Chapter 13 relief because he had arranged repayment plans
with the IRS and the Pennsylvania Department of Revenue, his largest creditors.

received from his speaking/consulting business. After conducting discovery, the UST filed a motion to amend the Complaint, which was granted by the Court. The UST filed an Amended Complaint on May 13, 2011, asserting that Debtor had made additional errors and omissions in his schedules and statements.

Trial on the Amended Complaint was held on September 19, October 3, and October 17, 2011. Based on Debtor's testimony on the second day of trial, the UST filed a motion to further amend her Amended Complaint to conform the pleadings to the evidence. The UST alleged that Debtor had testified to facts that established a cause of action under 11 U.S.C. § 727(a)(2). A hearing was held on the motion to amend on October 24, 2011. On November 7, 2011, an order was entered granting the UST's motion and on the following day the UST filed the Second Amended Complaint. Debtor answered the Second Amended Complaint on December 15, 2011, and a further hearing on the matter was set for February 15, 2012.

On December 22, 2011, the UST filed a motion for summary judgment on the Second Amended Complaint. Debtor answered the motion on January 18, 2012. In an order entered on February 8, 2012, the Court determined that the UST's summary judgment motion would be considered as a motion for judgment on partial findings under Fed. R. Civ. P. 52(c) and that a decision on the motion would be deferred until briefs were filed. The trial date was canceled, and a briefing schedule was set. Briefs have been filed, and the matter is now ripe for adjudication.

## II. Factual Findings

Debtor is a physician, and since 2007 has been employed full-time by Hamilton Health Center ("Hamilton") in Harrisburg, Pennsylvania as an HIV Specialist and as the Director of the

2

Department of Internal Medicine. Before he obtained full-time employment with Hamilton, Debtor was in private practice in Philadelphia. In April 2007, Debtor closed his Philadelphia practice and relocated to the Harrisburg area.

Debtor's Chapter 13 creditors' meeting was held on August 13, 2009. At the meeting, Debtor stated under oath that he had reviewed his schedules and that they listed all of his assets and all of his debts. Debtor represented that he had filed his 2008 tax returns, but his attorney, Deborah Hughes, corrected him noting that the tax return had been prepared, but not yet filed. When the Chapter 13 trustee asked whether Debtor had completed the means test form (Official Form 22C), Attorney Hughes insisted that Debtor did not need to file the form because "he is a business." The Chapter 13 trustee disagreed, and Debtor eventually completed and filed the form.    After the case was converted to Chapter 7, Debtor appeared at the creditors' meeting held on December 10, 2010. Debtor stated under oath at the meeting that he had listed all his assets and all his debts. When asked whether he had any cars, Debtor responded yes. Attorney Hughes then stated that Debtor had acquired two vehicles while he was in Chapter 13. She further stated that Debtor was paying $500 a month for both vehicles. Attorney Hughes also described the closing of his Philadelphia medical practice and explained that Debtor filed for bankruptcy because of claims asserted against the practice.[3]

_____

[3]Both the Chapter 13 trustee and the Chapter 7 trustee permitted Attorney Hughes to answer questions on behalf of Debtor rather than requiring Debtor to respond. This informal approach to an examination under oath or affirmation creates the impression that bankruptcy is not a serious matter. The time for preparation of a client's testimony is before the client is placed under oath. Counsel should not be permitted to substitute coaching and personal testimony for client preparation. In the within case, this pattern continued after the adversary proceeding was commenced. At the deposition taken by the UST, which was made a part of the record as UST Exhibit C-3, Attorney Hughes responded directly at least 60 times to questions propounded by the UST. The purpose of a deposition is obtain information from a deponent under oath. It was

Debtor also submitted a completed 707(b) questionnaire signed by Debtor and Attorney Hughes. Debtor testified at the meeting that he had reviewed the questions, that he understood them, and that he was familiar with the answers that were provided.[4] The questionnaire required Debtor o report all income received. Although there was a specific line on the form for bonus income, none was reported. After reviewing the 2009 tax return that was presented at the creditors' meeting, the UST asked Debtor about the source of the consulting income disclosed on the return, which had not been reported on his amended schedule of income ("Schedule I") filed October 8, 2010. The initial response came from Attorney Hughes who stated that Debtor earned income from "extra consulting." Debtor then explained that he was a speaker for several pharmaceutical companies on topics related to HIV and that he had agreements with these companies to speak to AIDS service organizations, doctors' offices, and patient groups. Debtor stated that he did not report this income in his schedules because he only spoke when invited, and he could not predict when that would occur.

A. *Debtor's income*

When Debtor filed his petition in June 2009 he was working at Hamilton under a two-year agreement (the "2007 Agreement") that provided for a base salary of $138,500 per year payable in bi-weekly installments of $5,326.92. The 2007 Agreement expired on June 30, 2009.

---

inappropriate and unprofessional for counsel to interject her own responses. (Other bankruptcy courts have expressed surprise at the degree to which trustees permit debtors' counsel to "testify" on behalf of their clients. *See Davis v. Weddington (In re Weddington)*, 457 B.R. 102, 108 n.9 (Bankr. D. Kan. 2011)(observing that debtor's attorney "testified" on critical issues at the Chapter 13 and Chapter 7 creditors' meetings and at a 2004 examination with no objection by the trustee)).

[4]At the hearing held on October 3, 2011, Debtor recanted the testimony presented at the creditors' meeting and stated that he had not read the 707(b) questionnaire.

4

Although not specified in the agreement, payroll records from Hamilton document that Debtor's income varied based upon the number of hours worked during a two-week pay period. Until September 12, 2008, Hamilton calculated Debtor's income at a rate of $66.58 per hour, which is computed by dividing the annual rate ($138,500) by the number of weeks (52) divided by the number of hours (40). The 2007 Agreement also provided that Debtor would be paid additional compensation based upon certain incentives, including the number of patients seen during a calendar quarter. After September 2008, Debtor's hourly rate increased to $68.99 for the remainder of the term.

When his new employment contract became effective in August or September 2009 (the "2009 Agreement"), Debtor's annual salary increased to $150,000, or an hourly rate of $72.11, payable in bi-weekly installments of $5,769.23 retroactive to July 1, 2009. The 2009 Agreement also provided for incentive pay based upon the number of patients seen. When Debtor provided information to his counsel in connection with the preparation of his petition, he noted that he might get a raise in July 2009. The possibility of a raise, however, was not disclosed on Debtor's Schedule I. Debtor did not provide a copy of the 2007 Agreement to his counsel before he filed, and he did not provide her with a copy of the 2009 Agreement when it became effective.

Debtor did not amend his Schedule I to disclose the higher salary he began receiving approximately two months after he filed his petition. Debtor, however, did provide his counsel with copies of his pre-petition pay statements, which included information that Debtor earned bonus income in 2009. On the date the petition was filed, Debtor submitted several pay statements, including a statement dated June 19, 2009. This statement reported year-to-date income of $81,461, including bonus income of $7,710. When questioned about bonus income at

5

a deposition conducted on April 4, 2011, Debtor stated that it was possible for him to earn bonus income under his 2009 Agreement based upon the number of patients he saw, but he asserted that this provision was not included in the 2007 Agreement. Debtor never amended Schedule I to report bonus income received.

When the amount of his income was questioned by the UST at trial, Debtor testified that he assumed that the pay he reported on Schedule I included bonus income because the amount was higher than what he would be entitled to receive under his base salary. The income he reported on Schedule I, however, reflected the monthly amount he was receiving under the 2008 adjustment to the base amount of his 2007 Agreement, not bonus income.

In addition to the services he renders as a treating physician, Debtor serves as a consultant/speaker concerning the treatment of HIV infections and AIDS. According to his income tax records, his gross earning from his consulting business totaled $43,245 in 2008. In the same year he reported that his business expenses exceeded his gross earnings by $85. For tax year 2009, Debtor's federal income tax return reflects net consulting income of $34,313 based on gross earnings of $51,023. His 2010 tax return shows net consulting income of $22,523 based on gross earnings of $44,601. Debtor did not report his speaking engagement income on his original Schedule I or on the first two amendments to Schedule I.[5] He provided no information to the Chapter 13 trustee that he had received income from his speaking engagements during the year before he filed his petition or that he expected to receive income from theses sources in the

_____

[5]Debtor also failed to disclose his speaking income on the original means test form, which requires the disclosure of gross receipts from the operation of a business as well as ordinary and necessary business expenses. He also failed to include this information on any of the amended versions of the form he filed while in Chapter 13. This information was necessary to accurately calculate Debtor's current monthly income and his disposable income.

6

future. On April 16, 2011, Debtor filed a third amended Schedule I in which he stated that income from his speaking engagements was unknown. Attorney Hughes stated that she advised Debtor not to report his speaking income on Schedule I when the Chapter 13 petition was filed because it was not "regular." She further informed him that it should be reported after the 2009 tax return was filed. [6]

### B.  Debtor's assets

Debtor resides in Hummelstown, Pennsylvania in a home that was purchased in July 2007. Although the home is titled in the name of Debtor's mother, at deposition Debtor testified that he "put every dime up to get the house." Debtor's mother leases the property to Debtor at a monthly rent equal to the amount of the mortgage payment.  Under the terms of the lease agreement between Debtor and his mother, Debtor has an option to purchase the property, which may be exercised until November 2024 – the date the last mortgage payment is due.  Debtor failed to disclose this purchase option as an asset on his original schedule of real property ("Schedule A").  On May 20, 2010, Debtor filed an amended Schedule A disclosing the option. He valued the residence at $221,000.

 At the time his bankruptcy case was commenced, Debtor had an ownership interest in a 2002 Pontiac that was titled jointly with his partner, Eric Dayd ("Dayd"), which had been

---

[6]At trial, the UST introduced as UST Exhibit 17 a copy of the speaking agreement between Debtor and Gilead Sciences, Inc. for the period March 21, 2009 to April 30, 2010. The agreement provided that Debtor would speak at least twice during the term of the agreement. This agreement was not disclosed on either Schedule I or Schedule G (executory contracts). Schedule I was amended for the third time on April 6, 2011 at which time Debtor disclosed that he expected to increase speaking engagement income to pay taxes. Schedule G was never amended to disclose the existence of the Gilead Sciences, Inc. speaking agreement or other similar speaking agreements.

7

purchased in December 2008. Debtor failed to disclose this interest on his original schedule of personal property ("Schedule B") and testified at trial that he did not realize that assets held jointly with another person had to be disclosed. He testified somewhat differently at a deposition held before trial on March 25, 2011. At the deposition he stated that he did not own a vehicle when he filed his petition and that his transportation needs were being met by "getting rides." [7]

### C. Debtor's pre-petition tax issues

Although Debtor had once been engaged in the private practice of medicine and had worked as a consultant/speaker for various pharmaceutical companies, his financial record keeping practices were haphazard. Debtor kept all of his tax records in a box, including 1099 statements from his speaking engagements and expense receipts related both to his employment and to volunteer work. At the end of each year Debtor gave these records to his accountant to prepare his tax returns.

In 2008, the IRS threatened to pursue garnishment proceedings against Debtor for delinquent taxes. Debtor was solicited by the Progressive Tax Group ("Progressive"), which promised to prevent Debtor's wages from being garnished and tonegotiate a plan for the payment of delinquent taxes. Progressive also offered to prepare Debtor's 2007 and 2008 tax returns.

---

[7]In addition to the Pontiac, Debtor testified about a variety of motor vehicles that he owned or operated between 2008 and his December 2010 creditors' meeting. At an April 4, 2011 deposition taken by the UST, Debtor stated that he operated a 1995 Toyota 4Runner that was owned by his brother. At trial held on October 3, 2011, he stated that at some later time he thought he owned the vehicle, but that after reviewing records at PennDOT he discovered that the Toyota was titled in Dayd's name and that he had never owned it. The records at PennDOT also revealed that Debtor had transferred a 2001 Ford Mustang to Dayd in the fall of 2008. Around the time the petition was filed, Debtor asked his brother to sell both the Toyota and the Pontiac. After Debtor converted his case to Chapter 7, he reported at the creditors' meeting that the Toyota and Pontiac were traded in to acquire a 2002 Altima and a 2001 Blazer. According to Debtor's testimony, both of these vehicles were titled in his brother's name.

8

Fearing imminent garnishment of his wages by the IRS, Debtor contacted Progressive in June or July of 2008 to arrange for its services. Progressive prepared the 2007 tax return, but failed to make good on its promise to prevent Debtor's wages from being garnished. The IRS garnished four of Debtor's paychecks between December 2008 and February 2009 in an approximate amount of $10,000. Eventually, Progressive negotiated a repayment plan with the IRS that required Debtor to pay $4500 a month on delinquent taxes. Debtor made two payments under the negotiated plan and then stopped when he found he could not afford to make the payments. In June 2009, the IRS again threatened to garnish Debtor's wages.[8] Debtor did not receive his 2008 return from Progressive until August 2009, after he had filed his bankruptcy petition.

### D. Debtor's pre-petition transfers of property

The IRS filed an amended proof of claim on September 9, 2009, listing a secured claim of $5,560.98, an unsecured priority claim of $91,065.43, and a general unsecured claim, including interest and penalties, of $166,568.28. According to the filed amended proof of claim, Debtor owes federal income taxes for 2000 through 2003 and for 2006 through 2008. On September 19, 2011, Debtor testified that on September 8, 2008 he transferred his interest in a 2001 Ford Mustang to Dayd because he was concerned that the IRS might seize the vehicle. At the time the transferred occurred, Debtor's wages had been garnished, and the IRS had filed liens. Debtor did not disclose the transfer of the Ford Mustang on his Statement of Financial Affairs ("SOFA") although the transfer occurred nine months before Debtor filed his petition.

---

[8]At the same time Debtor was facing possible renewed garnishment of his pay by the IRS, a judgment creditor had scheduled a sheriff's sale of Debtor's personal property. These events caused Debtor to seek relief in the bankruptcy court.

9

In conjunction with the closing of his Philadelphia medical practice, Debtor sold certain medical equipment, including two examination tables. Debtor did not disclose these transfers on his SOFA. When Debtor was questioned about the transfer of the examination tables at deposition, he stated that he sold the tables for $500 in 2008. At the hearing on October 3, 2011, however, Debtor said the tables were transferred in 2007, not 2008, and that they were given to the Philadelphia AIDS Consortium, which had been leasing space to Debtor. When questioned about why his explanation had changed, Debtor responded that he had been confused at his deposition.

### III. Discussion

*A. Federal Rule of Civil Procedure 52(c)*

This matter was taken under advisement pursuant to Fed. R. Civ. P. 52(c), which is made applicable in bankruptcy by Fed. R. Bankr. P. 7052. Rule 52(c) provides:

> Judgment on Partial Findings. If during a trial without a jury a party has been fully heard on an issue and the court finds against the party on that issue, the court may enter judgment as a matter of law against that party with respect to a claim or defense that cannot under the controlling law be maintained or defeated without a favorable finding on that issue, or the court may decline to render any judgment until the close of all the evidence. Such a judgment shall be supported by findings of fact and conclusions of law as required by subdivision (a) of this rule.

Fed. R. Civ. P. 52(c).

Rule 52 enables a judge in a bench trial to forestall the trial process when it becomes clear that additional evidence will not change the conclusion on an ultimate issue. *In re Machne Menachem, Inc.,* 425 B.R. 749, 755 (Bankr. M.D. Pa. 2010) (citing 9 Moore's Federal Practice 52–124, ¶ 52.50[2]). While the Rule respects the right of a party to be "fully heard," that right "does not amount to a right to introduce every shred of evidence that a party wishes, without

regard to [its] probative value . . . ." *EBC, Inc. v. Clark Bldg. Systems, Inc.*, 618 F.3d 253, 272 (3d Cir. 2010). Thus, Rule 52 enables a court to enter judgment before the affected party rests its case.

In deciding the merits of a matter under Rule 52(c), the trier of fact "applies the same standard of proof and weighs the evidence as it would at the conclusion of trial." *Id.* Therefore, the court "does not view the evidence through a particular lens or draw inferences favorable to either party." *Id.* Moreover, the court may "make determinations of witness credibility where appropriate." *Id.* at 273.

B. *Chapter 7 discharge*

The UST objects to Debtor's discharge under §§ 727(a)(2)(A) and 727(a)(4)(A) which state in relevant part:

(a) The court shall grant the debtor a discharge, unless-

> (2) the debtor, with the intent to hinder, delay, or defraud a creditor or an officer of the estate charged with custody of the property under this title, has transferred, removed, destroyed, mutilated, or concealed, or has permitted to be transferred, removed, mutilated, or concealed-

> > (A) property of the debtor, within one year before the date of the filing of the petition; or

> > * * *

> > (4) the debtor knowingly and fraudulently, in or in connection with the case –

> > > (A) made a false oath or account . . . .

11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4)(A).

The discharge under Section 727 of the Bankruptcy Code is the primary tool used to build a debtor's fresh start. Denial of a debtor's discharge is a severe sanction and should not be imposed lightly. *Rosen v. Bezner*, 996 F.2d 1527, 1531 (3d Cir 1993); *Stapleton v. Yanni (In re Yanni)*, 354 B.R. 708, 712 (Bankr. E.D. Pa. 2006) (citing *Rosen*, 996 F.2d at 1531). The Bankruptcy Code, however, exacts a quid pro quo for the entry of a discharge. In exchange for the broad forgiveness of debt, a debtor must make full disclosure of all matters relevant to the administration of the bankruptcy estate. *Heidkamp v. Whitehead (In re Whitehead)*, 278 B.R. 589, 594 (Bankr. M.D. Fla. 2002) (citing *Kentile Floors, Inc. v. Winham,* 440 F.2d 1128 (9th Cir.1971)). In some circumstances, a discharge may be denied "to make certain that those who seek the shelter of the [B]ankruptcy [C]ode do not play fast and loose with their assets or with the reality of their affairs." *Razzaboni v. Schifano (In re Schifano),* 378 F.3d 60, 66 (1st Cir. 2004). *See also Harris v. Dawley (In re Dawley)*, 312 B.R. 765, 785 n.32 (Bankr. E.D. Pa. 2004).

A debtor does not bear the initial burden of convincing the court that he is entitled to a discharge. It is the plaintiff who has the burden of proving an objection to discharge by a preponderance of the evidence.[9] *See Grogan v. Garner*, 498 U.S. 279, 289-90 (1991); *Wachovia*

---

[9]In prosecuting a complaint under § 727(a)(4)(A), the burden of proof is a shifting one. "The party objecting to discharge must show that [the] debtor omitted information which he knew should have been disclosed in his schedules for the specific purpose of misleading his creditors and not simply because the debtor was careless or failed to fully understand his attorney's instructions." *PaineWebber, Inc. v. Gollomp* (*In re Gollomp)*, 198 B.R. 433, 437 (S.D. N.Y. 1996) (citations and internal quotations omitted). Accordingly, "[w]here it reasonably appears that the oath is false, the burden falls upon the debtor to come forward with evidence to prove that it was not an intentional misrepresentation. If the debtor fails to provide such evidence or a credible explanation for his failure to do so, a court may infer fraudulent intent." *Id.* (citations and internal quotations omitted).

12

*Bank, N.A. v. Spitko (In re Spitko)*, 357 B.R. 272 (Bankr. E.D. Pa. 2006); Fed. R. Bankr. 4005.

  *C. Objection to Debtor's Discharge under § 727(a)(2)(A)*

  To deny a debtor's discharge based upon a fraudulent transfer or concealment of assets under § 727(a)(2)(A), a plaintiff must prove: (1) a transfer or concealment of property; (2) that belonged to the debtor; (3) that occurred within one year of the petition date; and (4) that was undertaken with actual intent to hinder, delay, or defraud one or more creditors or the bankruptcy trustee. *United States Trustee v. Zimmerman (In re Zimmerman),* 320 B.R. 800, 806 (Bankr. M.D. Pa. 2005) (citing *In re Schifano,* 378 F.3d at 66; *Rosen,* 996 F.2d at 1531). In the case before me, the UST has proven each of these elements through Debtor's testimony.

  At two separate points in the three-day trial, Debtor admitted that approximately nine months before he filed his petition, he transferred his Ford Mustang to Dayd to prevent the IRS from seizing the vehicle to satisfy tax claims. The first admission came in response to a series of questions posed by the UST regarding the Toyota 4Runner that Debtor had purchased in 2008 and titled in Dayd's name. The following excerpts convey the substance of Debtor's admission.

Q: So why did you purchase [the 4Runner] and put it in – the title in [Dayd's] name?

A: Because when we purchased it, there were issues with the – when it was purchased there were issues with the IRS.
                                    ***
Q: All right. And you didn't put it in your name because you were afraid the IRS might take it back?

A: Yes.

Q: Okay. Now, the second paragraph of [the Answers to the Second Set of Interrogatories] says that: "The Penn DOT records showed that in 2008, I transferred my

13

2004[10] Ford to Eric Dayd." All right. Why did you transfer that title?

A: For the same reason I previously stated.

(September 19, 2011 N.T. 117.)

Debtor reiterated the reason for the transfer of the Ford Mustang on direct examination at

the hearing on October 3, 2011:

Q: Did you discover anything else about any other vehicles when you finally made the trip to PennDOT?

A: Yes

Q: Okay. And what did you [discover]?

A: That I had – there had been a transfer of a Ford to my partner in 2008, I –

The Court: You had transferred?

A: I had transferred a Ford to my partner.

The Court: In 2008?

A: In 2008. And – toward the fall of 2008. I had done that when the IRS had started threatening to garnish and take things.

(October 3, 2011 N.T. 50-51.)

Debtor stated that he failed to report the transfer on his SOFA because he understood that

he was only required to report transfers of real property. The Court finds this explanation to be

unconvincing. The terminology used in the schedules and statements distinguish between real

and personal property when the distinction is relevant. Schedule A refers to real property and

---

[10]The UST read the model year of the vehicle incorrectly in the excerpt from the Answer to the Second Set of Interrogatories. As demonstrated by a review of Exhibit 30, p. 9, the answer to Interrogatory 6 states: " The PennDot [sic] records showed that in 2008 I transferred my 2001 Ford to Eric Dayd."

14

Schedule B refers to personal property. Item 10 of the SOFA, which Debtor asserted he thought only referred to personal property, requires a debtor to disclose "all other property" without reference to real or personal property. In response to the requirement in Item 14 to "list all property owned by another person that the debtor holds or controls," Debtor understood that the term "property" included personal property. In response to Item 14, Debtor stated that the furnishings in the house he rented from his mother were owned by his mother. It is difficult to understand why Item 10 would have confused Debtor when he understood that personal property was included in the term "property" when he completed Item 14.

Debtor later attempted to justify the omission as insignificant, arguing that the Mustang was of little value. This assertion, however, does not advance Debtor's position. The bankruptcy process is grounded on the complete and candid disclosure of a debtor's assets, income, expenses, and liabilities. *See generally Oneida Motor Freight, Inc. v. United Jersey Bank*, 848 F.2d 414 (3d Cir. 1988) (holding that a debtor's failure to disclose a claim may bar later pursuit of the claim). Even assets that a debtor believes have minimal value still must be reported. "[T]he amount out of which a debtor's creditors are defrauded as a result of a transfer has no bearing on whether § 727(a)(2)(A) applies. . . ." *Williams v. Hoza (In re Hoza)*, 373 B.R. 409, 416 (Bank. W.D. Pa. 2007). "Even an inept debtor whose actions do not succeed in depriving creditors of much in the way of value which could be used to satisfy their claims may nonetheless actually intend to defraud his or her creditors for purposes of § 727(a)(2)(A)." *Id. See also In re Spitko*, 357 B.R. at 301(holding that lack of injury to creditors is irrelevant when assessing whether debtor's actions were fraudulent).

15

Debtor argues in his brief that the statements he made at trial concerning the transfer of the Ford Mustang to Dayd did not constitute an admission. In support of this assertion, Debtor points to a later statement in the record where he stated that he did not remember why he transferred the Toyota 4Runner. Debtor insists that the latter statement makes his earlier admission ambiguous. This strained attempt to rehabilitate Debtor's earlier testimony rings hollow. His admission that the vehicle was transferred to hinder possible seizure by the IRS was clear and bolstered by numerous instances described at trial in which he went to great lengths to ensure that property he used was placed beyond the reach of creditors. On this basis alone I conclude that Debtor's discharge should be denied under § 727(a)(2)(A).

> ### D.  Objection to Debtor's Discharge under Section 727(a)(4)(A)
>
> #### 1.    Duty of disclosure

A debtor has an affirmative duty to provide complete disclosure of "all assets [and] liabilities and to answer all questions fully and with the utmost candor." *In re Spitko*, 357 B.R. at 312 (citing *Montey Corp. v. Maletta (In re Maletta)*, 159 B.R. 108, 112 (Bankr. D. Conn. 1993)). Creditors and the trustee are entitled to receive adequate information regarding a debtor's assets, liabilities, and financial affairs without initiating an investigation. *Clark v. Kearns (In re Kearns)*, 149 B.R. 189, 192 (Bankr. D. Kan. 1992) (citing *In re Hiegel*, 117 B.R. 655, 659 (Bankr. D. Kan. 1990)); *DeAngelis v. Johnson (In re Johnson)*, 2009 WL 65246, *12 (Bankr. E.D. Pa.) (trustee and parties in interest are not required to conduct investigation; debtor obligated to provide full disclosure of relevant information). "Neither the trustee nor the creditors should be required to engage in a laborious tug-of-war to drag the simple truth into the glare of daylight." *Boroff v. Tully (In re Tully),* 818 F.2d 106, 110 (1st Cir. 1987); *Nickless v.*

16

*Fontaine (In re Fontaine)*, 467 B.R. 267, 272 (Bankr. D. Mass. 2011) (quoting *In re Tully*). Not only are creditors and trustees entitled to adequate information, they are entitled to receive information in a timely manner. Section 727(a)(4) is intended "to insure that complete, truthful, and reliable information is put forward at the outset of the proceedings, so that decisions can be made by the parties in interest based on fact rather than fiction." *Id.*

        2.    *Elements for denial of discharge*

A plaintiff seeking denial of a debtor's discharge under § 727(a)(4)(A) must prove that:

> (1) [the debtor] made a statement under oath; (2) the statement was false; (3) [the debtor] knew the statement was false; (4) [the debtor] made the statement with fraudulent intent; and (5) the statement related materially to the bankruptcy case.

*Matter of Beaubouef*, 966 F.2d 174, 178 (5th Cir 1992), *cited in In re Spitko*, 357 B.R. at 312. *Accord Keeney v. Smith (In re Keeney)*, 227 F.3d 679, 685 (6th Cir. 2000); *Moore v. Strickland (In re Strickland)*, 350 B.R. 158, 163 (Bankr. D. Del. 2006). *See also In re Zimmerman*, 320 B.R. at 806 (citations omitted). False statements covered by the section include those made in a debtor's bankruptcy petition, schedules, and statements. *Neugebauer v. Senese (In re Senese)*, 245 B.R. 565, 574 (Bankr. N.D. Ill. 2000).[11] It also applies to statements made under oath at a creditors' meeting held under 11 U.S.C. § 341(a), in discovery depositions conducted in connection with a complaint to deny a discharge, and in proceedings before the court. *Desiderio v. Parikh (In re Parikh)*, 456 B.R. 4, 28 (Bankr. E.D.N.Y. 2005) ("[m]aterially false statements made or omitted as part of the bankruptcy petition, schedules, at an examination or during the proceedings themselves may constitute false statements under oath for purposes of section

---

[11]Section 727(a)(4) applies to unsworn declarations under penalty of perjury as well as to statements made under oath. *Strominger v. Giquinto (In re Giquinto)*, 388 B.R. 152, 178 (Bankr. E.D. Pa. 2008).

17

727(a)(4)(A)”); *Randolph v. Somerville (In re Somerville)*,73 B.R. 826, 835 (Bankr. E.D. Pa.

1987) (holding that debtor's sworn affirmation of the truthfulness and accuracy of schedules and

statements at creditors' meeting could have formed basis to deny discharge); *Lissack*

*Enterprises, Inc. v. Braidis (In re Braidis)*, 27 B.R. 470, 473 (Bankr. E.D. Pa. 1983) (holding that

discharge should be denied for fraudulent statements made at deposition and at creditors'

meeting).

      The UST asserts that Debtor's schedules contain numerous errors and omissions and that

he acted in reckless disregard of his duty to provide complete and accurate information regarding

his financial affairs. If a plaintiff proves that a debtor knowingly omitted material information

with the intent to deceive creditors or the trustee, it is appropriate to deny the debtor's discharge.

Even an omission or misstatement of material information made with a "reckless indifference to

the truth" may suffice to establish fraudulent intent. *In re Keeney*, 227 F.3d at 685-86 (reckless

disregard for whether a representation is true satisfies the intent requirement of

§ 727(a)(4)(A)).

      Not all omissions or errors, however, lead to denial of a discharge. A debtor that is

merely careless in preparing schedules and statements or in testimony in connection with a case

may receive a discharge absent proof of fraudulent intent. *Bauman v. Post (In re Post)*, 347 B.R.

104, 112 (Bankr. M.D. Fla. 2006) (citation omitted); *Estate of Harris v. Dawley (In re Dawley)*,

312 B.R. 765, 785 (Bankr. E.D. Pa. 2004). Further, a debtor who relies on the advice of counsel

who is generally aware of all relevant facts also will not be found to have made a false oath. *In*

*re Topper*, 229 F.2d 691, 693 (3d Cir. 1956) *cited in In re Georges*, 138 Fed. Appx. 471, 472 (3d

Cir. 2005); *In re Dawley*, 312 B.R. at 787.

18

The errors and omissions in Debtor's schedules and statements cited by the UST include:[12] (a) an option to purchase the residence he was renting from his mother; (b) his ownership of a 2002 Pontiac; (c) his car payment expense of $500 per month; (d) anticipated pay increases through his employment contract with Hamilton; (e) income from speaking engagements; (f) year-to-date income for 2008 and 2009; (g) the transfer of the Ford Mustang to his partner; and (h) the sale of office equipment.[13]

The elements of § 7272(a)(4)(A) may be established by circumstantial evidence. *Benchmark Bank v. Crumley (In re Crumley)*, 428 B.R. 349, 366 (Bankr. N.D. Tex. 2010). A court may consider whether there is a series of errors and omissions that individually may not provide sufficient proof of intent to defraud, but when considered as a whole, point to a pattern of fraud. In this case, the UST has cited numerous deficiencies in Debtor's schedules and statements, which are discussed below.

_____

[12]The UST has cited additional errors and omission in support of the § 727(a)(4)(A) count of the Second Amended Complaint. Some of these omissions, such as Debtor's failure to disclose his ownership of a stethoscope and blood pressure cuff, while supporting the UST's allegation that Debtor has displayed a reckless disregard for his duty to fully disclose his financial affairs, are less significant omissions and will not be considered in deciding this matter. The errors and omissions discussed herein provide ample grounds to support denial of Debtor's discharge under § 727(a)(4)(A).

[13]In testimony provided by Debtor at trial he revised earlier statements he had made that the examination tables used in his medical practice were transferred in 2008. At trial he testified that the transfers were made in April 2007, more than two years before Debtor filed his bankruptcy case. Accepting this representation as true, Debtor was not required to disclose this transfer on the SOFA. Nonetheless, the disposition of the examination tables will be discussed because Debtor's inconsistent prior statements bear on his general lack of credibility.

On the original Schedule A filed in the case, Debtor stated that he did not hold an interest in real estate. This statement was false. While Debtor does not own the home in which he resides, he leases the property from his mother, and the lease includes an option to purchase the property. The lease agreement provided Debtor with the exclusive option to acquire the Hummelstown property with credit against the purchase price to be given for all previous rental payments.

A debtor not only is required to disclose legal interests in property, he also must disclose beneficial interests, such as a purchase option. *DeAngelis v. Von Kiel (In re Von Kiel)*, 461 B.R. 323, 340 (Bankr. E.D. Pa. 2012). Although Debtor listed the lease on his schedule of executory contracts and leases ("Schedule G"), the purchase option contained in the lease was not disclosed on Schedule A. No evidence was presented that Debtor provided his counsel with a copy of the lease or informed her of the option to purchase. Nearly a year after the petition was filed, Debtor filed an amended Schedule A in which he disclosed the option.

Filing the amendment to his schedules, however, does not necessarily negate a conclusion that the omission was fraudulent. This is especially true when the amendment was filed only when erroneous information was brought to light by a trustee or creditor. *See In re Chalik*, 748 F.2d 616, 619 (11th Cir. 1984) (affirming denial of discharge where corporate ownership not disclosed until discovered by trustee), *cited in In re Strickland*, 350 B.R. at 164. In this case, Schedule A was amended to report the option to purchase only after Debtor became aware that the Chapter 13 trustee would require him to devote less income to his Chapter 13 plan if the payments he was making to his mother were treated as payments to a secured creditor

20

rather than as rent. Debtor did not make full disclosure of the option to purchase until he thought reporting the details of this arrangement would be to his advantage.

(b).    <em>Motor vehicles</em>

Debtor reported on Schedule B that he had no interest in any motor vehicles on the date he filed his petition. He also did not include any installment payments for a motor vehicle on Schedule J. Debtor has since admitted these statements were incorrect. On the date of the petition, Debtor owned a 2002 Pontiac jointly with Dayd and was making monthly vehicle payments of $500. His partner owned a Toyota 4Runner, which was paid for and used by Debtor, although it is unclear from the record whether Debtor was using the Toyota at the time the petition was filed.

At his Chapter 13 creditors' meeting held on August 9, 2009, Debtor again stated that he had reported all his assets and that he held no interest in any motor vehicles when he filed. On February 8, 2010, Debtor filed an amended Schedule J in which he disclosed the monthly installment payment of $500 for the Pontiac. However, he did not amend Schedule B to disclose his interest in the Pontiac. After his case was converted to Chapter 7, Debtor stated at the creditors' meeting held on December 10, 2010 that he owned two vehicles – a 2002 Altima and a 2001 Blazer. Debtor further explained that he had purchased these vehicles while he was in Chapter 13. He did not disclose at the meeting, however, that he acquired the Altima and the Blazer by trading in the Toyota and the Pontiac or that he and Dayd owned the Pontiac on the date he filed for bankruptcy relief.

The UST deposed Debtor on March 25, 2011 in connection with the Amended Complaint. Debtor was again asked to confirm that he had no interest in any vehicles when he

21

filed his petition. Debtor responded in the affirmative. When the UST asked about how his transportation needs were being met, Debtor responded that he "was getting rides." Later in the deposition Debtor was questioned about why his expenses on Schedule J included auto insurance when he did not own a vehicle. Debtor stated that he was paying insurance on two vehicles his brother had purchased and financed and that he and his partner were using.[14] This testimony varied from statements made at the Chapter 7 creditors' meeting where he stated that he, not his brother, owned the Altima and Blazer.

At the continued deposition on April 4, 2011, Debtor also revised his earlier testimony on the status of the Toyota, stating that, after reconsideration, he believed he owned the Toyota and that it had been sold immediately before he filed for bankruptcy. After the deposition, Debtor went to PennDOT and obtained title information about the Toyota and the Pontiac. The documentation received established that Dayd owned the Toyota and that Dayd and Debtor owned the Pontiac, which had been purchased in 2008. At trial, Debtor stated that although he purchased the Toyota and drove it on a regular basis, the vehicle had been titled in Dayd's name because of "issues with the IRS." At a later point in the trial, when the UST questioned Debtor as to why the vehicle had been titled in his partner's name, Debtor stated that he could not remember.

At trial the UST asked Debtor why he did not report the Pontiac on his schedules. Debtor responded that he thought he only had to report assets that he owned in his sole name. Like Debtor's professed confusion about the distinction between real and personal property, I do not

---

[14]Although the vehicles were not specifically described, the Court assumes he was referring to the Altima and the Blazer.

find credible Debtor's representation that he did not understand that jointly-owned assets had to be reported. I find support for this conclusion in Schedule B, which explicitly demands that a debtor state whether property is owned jointly with another person. Debtor was pressed for information about his vehicles at several points because other documentation he provided belied his representation that he did not own a vehicle. If Debtor was confused as to the ownership of the various vehicles that he and his partner operated when he filed his petition and during the pendency of his Chapter 13 case, he had numerous opportunities to obtain the correct information and provide full disclosure.[15] Instead, Debtor offered guesses and  incoherent explanations that only confused the issue. Even if Debtor did not know at the outset of the case that he was required to include joint assets on his schedules, he certainly became aware of this requirement after the UST filed her Complaint. However, he continued to evade his responsibility to provide accurate information. The answers Debtor provided at his creditors' meeting, at deposition, and at trial were intended to forestall further inquiry and not to provide full disclosure. The UST's attempt to obtain information about Debtor's ownership of motor vehicles and the disposition of those vehicles provides the quintessential example of a "tug-of-war to drag the simple truth into the glare of daylight" described by the First Circuit in *In re Tully.* At a minimum, Debtor's testimony about his ownership of various motor vehicles, and in particular the 2002 Pontiac, was given with "reckless indifference to the truth."

---

[15]When a highly educated debtor makes numerous false statements while being represented by competent counsel, it is unlikely that a court will find credible a debtor's excuse that the false statements were made because he was confused. *See Peoples Bank of Charles Town v. Coburn (In re Coburn)*, 145 B.R. 851, 858 (Bankr. E.D. Va. 1992).

### (c). Car payment expense

At the time Debtor filed his bankruptcy case he was making installment payments on a vehicle loan for the Pontiac. This payment was not disclosed on Schedule J until February 8, 2010. Further, the loan was not included as a claim on either the schedule of creditors holding secured claims ("Schedule D") or the schedule of creditors holding unsecured claims ("Schedule F"). Debtor's explanation for this omission seemed to be that because he thought he did not need to report the asset, he likewise was not required to report the expense. Debtor does not assert that his attorney advised him not to report expenses incident to jointly-held assets. Even if he reasonably believed that he did not have to report the ownership of the Pontiac, the $500 per month payment was an actual expense that would reduce the amount of disposable income. His explanation is not credible. The omission of this expense, while perhaps not intended to defraud creditors, is another example of Debtor's reckless indifference to providing full disclosure of his financial affairs.

### (d). Anticipated pay increases

One bankruptcy court has held that "any omission of income from a debtor's statements is material." *In re Crumley*, 428 B.R. at 360. When Debtor filed his petition in June 2009 he was working under the 2007 Agreement with Hamilton that was set to expire on June 30, 2009. Although he did not know what the precise terms of the 2009 Agreement would be when he filed, he anticipated receiving a new contract with a possible raise. When the 2009 Agreement became effective, Debtor's hourly rate under the new contract increased by approximately $3.00 an hour.  Debtor did not provide his counsel with a copy of the 2007 Agreement before he filed his petition, which would have described  a pay increase in 2008 and provisions for incentive

24

pay. Further, it was not until after the UST filed her Complaint in December 2010 that Debtor provided his counsel with the 2009 Agreement, which had been received by Debtor in September 2009. Both the 2007 and 2009 Agreements provided for incentive or bonus pay based upon the number of patients seen. Debtor was well aware of the bonus provisions, having explicitly testified that he intended to increase his income to fund his Chapter 13 plan by increasing patient bookings.

Debtor failed to disclose the possibility that he would receive bonus income in 2009 on Schedule I. In 2009 he received bonus income of $1914 and in 2010 he received bonus income of $36,984. Although he could not have known the amount of bonus income he would earn in 2010 when he filed his petition, within two months of the filing date he knew that he had the potential to earn significant bonus income. This information was never disclosed in a court filing or to the Chapter 13 trustee. Debtor repeatedly stated at trial that he had provided his counsel with information from which it could be determined that he was eligible to receive bonus income. In fact, he argued that the income listed on Schedule I included both bonus income and income from speaking engagements. This assertion is incorrect, and the Court is not convinced that Debtor believed that the income he reported on Schedule I included bonus and speaking income.

Attorney Hughes argues that because Debtor provided her with six months of pay statements, some of which included bonus income, Debtor should not be held responsible for failing to disclose the possibility of bonus income on Schedule I. Attorney Hughes' assertion that Debtor provided her with information disclosing some bonus payments raises the issue of

25

whether a debtor lacks the requisite fraudulent intent if counsel is responsible for an error or omission in connection with a statement under oath.

The Third Circuit addressed this issue in dicta in the case of *In re Topper*, *supra*. In *Topper*, the plaintiff sought denial of the debtor's discharge because the debtor had signed a verification that he had listed all his creditors when he had omitted creditors he intended to pay. The debtor admitted that he had disclosed only one creditor, a former landlord whose debt he intended to discharge, and that he had omitted all other debts. The bankruptcy referee ruled that the omissions constituted a false oath and denied the debtor's discharge, which was upheld by the district court. On appeal, the Third Circuit reversed the district court holding that actual intent to defraud was required. The Court observed that "bankruptcy schedules are prepared by counsel . . . . It is entirely understandable that a bankrupt may be guided by the opinion of his counsel . . . . [T]he advice of counsel may be an excuse for an inaccurate or false oath." *Id.* at 693 (citations omitted.).

In *In re Georges*, 138 Fed. Appx. 471 (3d Cir. 2005), an unpublished opinion interpreting the former Bankruptcy Code, the Third Circuit relied on *Topper*'s dicta to affirm a bankruptcy court's refusal to deny a debtor's discharge under § 727(a)(4). In *Georges*, a debtor's ex-husband had filed an objection to discharge on the grounds that the debtor had omitted certain property from her schedules. At trial, the debtor testified that she had only done so in reliance on the advice of her bankruptcy attorney. On appeal, the Third Circuit cited *Topper* and held that the debtor's reliance on the advice of her bankruptcy attorney was a sufficient excuse for the omission. *In re Georges*, 138 Fed.Appx. at 472, 2005 WL 1604010, *1.

26

A successful defense against a claim of false oath requires a debtor to show that he not only relied on the advice of counsel, but also that he provided counsel with all of the relevant facts. *In re Post,* 347 B.R. at 112 (citing *In re Topper*); *In re Tufano*, 2011 WL1473384, *5 (Bankr. M.D. Pa). In the matter before me, Debtor did not provide Attorney Hughes with a copy of his 2007 employment contract, from which she could have determined that he was eligible for bonus income. Moreover, it is clear that Debtor knew, when he filed his petition in June 2009, that the 2007 contract would expire within several weeks and a new one would go into effect. Yet Debtor did not provide Attorney Hughes with a copy of the new contract, which also provided for bonus income, until after the UST had filed the Complaint.

At the deposition held on March 25, 2011, it was obvious from the statements made by Attorney Hughes that she was unaware that the 2007 Agreement provided for bonus income. When the UST asked Debtor whether he had a "bonus plan" as part of his compensation package when he filed, the following exchange ensued:

A: There is a bonus plan, and I have a base salary.

> Ms. Hughes: Back in '09? We are not talking today. We are talking about what
> you had in '09.

A: No, there wasn't one.

> Ms. Hughes: It was just salary; right?

A: Right.

The comments of Attorney Hughes, interjected in the examination by the UST, demonstrate that she was unaware of the bonus provisions in effect when Debtor filed his petition. Likewise, when prompted by his attorney as to the "correct" answer, Debtor altered his

response. From this exchange the Court concludes that Debtor knew he could receive a bonus under the 2007 Agreement, but that he had not shared that information with his counsel. At a minimum, Debtor displayed a reckless disregard for the truth in the completion of Schedule I, and his failure to disclose the potential for bonus income is not excused.

(e).    *Speaking income*

Debtor received significant income from speaking engagements in 2008 and continued to earn income from this activity after he filed his bankruptcy petition. As an expert on AIDS and HIV, Debtor was under contract with several entities to provide speaking/consulting services. He failed to disclose anticipated income on Schedule I or the existence of several contracts for speaking services on Schedule G. His various explanations for these non-disclosures require some analysis.

At his March 25, 2010 deposition, Debtor stated that he did not disclose the income he had received from his speaking engagements because his 2008 tax return reflected a net loss after expenses. When reminded that he had stated earlier that he did not have his 2008 return when he filed his petition, he admitted that this statement was incorrect. At trial, Debtor testified that he informed his counsel about his consulting business prior to filing his petition, but that he did not know the amount he earned because it varied from year to year. He insisted that he could not provide information regarding the amount he earned from his 2008 speaking engagements because he had given all his documentation to his tax preparer. He further testified that counsel advised him to omit any reference to consulting business income on Schedule I, suggesting that an amendment could be submitted after the 2008 return was filed. Ultimately, the 2008 tax return

28

reported a net loss of $85 for the consulting business. Based on that loss, counsel advised Debtor that no amendment would be necessary.

Debtor's various excuses for why he did not report the income or, at a minimum, the existence of the contracts, do not justify the omissions. Debtor was required to report the income he received from his speaking engagements regardless of whether he had a net gain or a net loss. He edited the information he provided to his counsel to create the impression that he did not expect to earn significant sums from this activity and that, if he did, there would be little or no net income. He characterized the income as speculative when he knew he had received income during the year before he filed and when he expected to receive income in 2009. Although specifics eluded him in earlier testimony, at trial Debtor stated that his speaking engagements generally occurred between July and December, so he would not have earned income when he filed in June 2009.[16] Debtor's final defense is that he provided all information requested by his attorney and that she advised him that he was not required to report his consulting income.

On this point of law, Attorney Hughes was clearly incorrect. A debtor has "a duty to disclose all his income in his original schedules and a continuing duty to disclose changes in his financial situation during the pendency of his case." *In re Anderson*, 2009 WL 1065142, *3 (Bankr. N.D. Ala.) (debtor had duty to disclose receipt of proceeds from post-petition sale of Corvette automobile because they constituted "additional disposable income"). The reasons for

---

[16]This general representation about his speaking engagements is at variance with the representations Debtor made at his deposition in which he stated that "[a]s of now [March 25, 2011], I have only spoken twice, and one of those will be occurring in a week. As opposed to having two talks a month at least at one point, now we are down to one every other month." UST Ex. C-3 p. 17. At least in 2011, Debtor had speaking engagements outside the July through December time frame.

29

imposing this duty are obvious. "In return for the bankruptcy relief debtors receive through gaining a discharge, the Bankruptcy Code requires disclosure of all interests in property, . . . prior and ongoing business . . . transactions, and, foremost, honesty. The failure to comply with the requirements of disclosure and veracity necessarily affects the creditors . . . and the public's respect for the bankruptcy system. . . ." *Fokkena v.Tripp (In re Tripp)*, 224 B.R. 95, 98 (Bankr. N.D. Iowa 1998) (citing *Nat'l Am. Ins. Co. v. Guajardo (In re Guajardo),* 215 B.R. 739, 742 (Bankr. W.D. Ark. 1997)). "It is not for the debtor to pick and choose or to obfuscate answers" on his schedules. *In re Tripp*, 224 B.R. at 98 (citations omitted).

As discussed above, a debtor who provides his counsel with all of the relevant facts and then relies on the legal advice of counsel will not be found to have made a false oath under § 727(a)(4)(A). Debtor failed to provide information to his attorney about the earnings he had obtained from speaking engagements, specifically copies of the contracts and documentation he could have obtained from the organizations who engaged him to provide services. However, from the information he did provide, Attorney Hughes should have insisted that Debtor provide her with the contracts and with specific information about compensation he had received from prior services. While the precise amount of income was uncertain at the time of filing, she also should have ensured that Debtor supplemented Schedule I once the information was available.

The initial advice provided by Attorney Hughes that Debtor should omit income because it was "irregular" or uncertain was plainly wrong. If this advice were correct, a debtor compensated through commissions would never be required to report his income. Further, counsel's later advice that Schedule I did not need to be amended because there was a net loss is

30

incorrect as well. The expenses a debtor incurs in conducting a business are not immune from scrutiny by the trustee.

Although this is a close case as to whether Debtor's reliance on counsel's advice was reasonable, Attorney Hughes provided a justification for not disclosing information about his speaking income that, however flawed, convinced Debtor that this approach was appropriate. Accordingly, I find that Debtor lacked the requisite fraudulent intent when he failed to disclose income from his speaking engagements.

*(f).      Income for 2008 and 2009*

For similar reasons, the Court finds that Debtor's failure to report his income for 2008 and year-to-date income for 2009 was not fraudulent. Debtor relied on counsel's assurances that it was appropriate to omit income for 2008 and year-to-date income for 2009 while awaiting the preparation of his tax returns.[17] This is not to suggest that the absence of tax returns excused Debtor from disclosing his income. He could have obtained information on his earnings from other sources. At a minimum, he could have obtained the amount paid in salary from Hamilton and noted that the reported amount was estimated with further information to be provided. The advice given by Attorney Hughes was inaccurate, but Debtor's reliance on her expertise is understandable and precludes a finding of fraudulent intent.

---

[17]In defending Debtor's reliance on her advice not to report speaking income, Attorney Hughes states in her brief that at the time the UST filed her Complaint, Attorney Hughes routinely omitted information on Item 1 of the SOFA. Although she provides no justification for this practice, she submitted an exhibit with the Answer to the Amended Complaint listing twenty-two cases filed by her between January and September 2009 in which she did not complete Item 1. Attorney Hughes has acknowledged that this practice was inappropriate.

31

(g).     *Transfer of the Ford Mustang*

A debtor is required to disclose on Item 10 of the SOFA all sales or other transfers of property made during the two years preceding the filing of the bankruptcy petition. As discussed above, the Court has determined that Debtor transferred the Ford Mustang to his partner approximately nine months before he filed to frustrate possible collection efforts by the IRS. The Court does not find convincing Debtor's statement that he failed to report the transfer on his SOFA because he thought Item 10 only referred to transfers of real property. Debtor took several steps before he filed to protect assets, including the rental arrangement with his mother and the acquisition of vehicles in the names of third parties. His professed lack of understanding about the meaning of the term "property" is not believable. Therefore, Debtor's omission of the transfer constitutes a material, false statement made at least with reckless disregard for the truth.

(h).     *Sale of office equipment*

Debtor testified at trial that when he closed his medical practice in Philadelphia, he left his examination tables with the landlord in partial satisfaction of past due rents. This testimony was impeached by the UST, who introduced the transcript of a prior deposition in which he testified that he sold the tables for $500 prior to closing the practice. Debtor offered no explanation for this discrepancy. While the UST was unable to establish that the sale of the tables occurred within two years before the bankruptcy filing, the inconsistency in Debtor's testimony illustrates his lack of candor. *See Neary v. Stamat (In re Stamat)*, 2009 WL 2916834, *2 (N.D. Ill.) (debtors' failure to disclose "relatively minor assets and interest" was "part of a broader and inexcusable pattern of omissions.")

32

### 3. Summary of the evidence

The UST has met its burden to prove that Debtor made material false statements under oath that he either knew were false or were made with reckless disregard for the truth. Debtor failed to provide complete disclosure in his original and amended schedules of the option to purchase the Hummelstown property, the bonus or incentive income paid by Hamilton, and the ownership and transfer of motor vehicles as well as expenses related to those vehicles. "Such errors are too numerous, and in some instances are consistent with pre-bankruptcy behavior, as likely to be the product of inadvertence alone." *In re Spitko*, 357 B.R. at 318. Nonetheless, Debtor argues that the exigencies of an emergency filing and the demands of his profession should excuse his failure to provide complete, accurate information regarding his financial affairs.

The Court does not minimize the stress that Debtor has experienced as a physician treating gravely ill patients while working to get his financial house in order. But the Court cannot absolve a debtor from his responsibility to provide full and accurate information in his schedules and statements on the basis that he has a demanding profession. "A debtor's paramount duty is to carefully consider all of the questions posed on the petition, schedules, and statements, and to verify that all information listed is correct." *In re Crumley*, 428 B.R. at 367 (citation omitted). Debtor has not fulfilled this duty. At a minimum, Debtor has provided information about his assets, income, and expenses with reckless disregard for the truth. In some instances, particularly when Debtor was required to provide information about his motor vehicles, his responses were likely intended to create the false impression that he did not own a vehicle. Accordingly, I conclude that Debtor also should be denied a discharge under § 727(a)(4)(A).

33

## IV.  Conclusion

For the reasons set forth above, the UST's Second Amended Complaint objecting under 11 U.S.C. §§ 727(a)(2)(A) and 727(a)(4)(A) to the entry of Debtor's discharge will be granted and  Debtor's discharge will be denied.  An appropriate Order will be entered.[18]

**By the Court,**

Mary D France

Chief Bankruptcy Judge

Date:  August 17, 2012

---

[18]As a postscript, the Court notes that this adversary proceeding provided a disheartening display of acrimony and rudeness by counsel for both sides.  Attorney Lyons, while entitled to obtain information from Debtor to substantiate the significant unreimbursed medical expenses claimed on Schedule J, displayed a lack of sensitivity and good judgment when he asked Debtor at the Chapter 7 creditors' meeting to disclose information about his personal medical history. Many other parties were in attendance at the meeting and able to hear this inquiry into private information. Debtor protested that by merely asking the question, Attorney Lyons had violated the Health Insurance Portability and Accountability Act of 1996 ("HIPAA") and refused to answer. *See* 42 U.S.C. § 1320d-1 et seq. Without getting into a discussion of health privacy regulations, which are not germane to the issues before me, HIPAA privacy rules were not at issue. HIPAA only applies to covered entities, and in this situation, Debtor was appearing on his own behalf and not as a healthcare provider. *See* 42 U.S.C. § 1320d-1(a)(3). Nonetheless, this was a wholly unnecessary and irrelevant inquiry into a subject in which an individual has a right of privacy under the 14th Amendment. *See Doe v. Delie*, 257 F.3d 309, 315 (3d Cir. 2001).  It is appropriate to question a debtor's monthly medical expenses if the claimed expenses seem inflated. Questions about a medical diagnosis, however, are rarely appropriate when Debtor's medical condition is not at issue. If a debtor's medical condition is at issue, disclosure usually is required subject to a protective order. In this case, Debtor was justified in expressing his concerns about being forced to reveal private information.

For her part, Attorney Hughes chose to parlay this blunder into a claim of bias. Based upon Attorney Lyons' alleged personal bias against Debtor, she asked that the Amended Complaint be dismissed. The Court denied this request hoping the parties would focus on the issue at hand going forward. Sadly, the acrimony between counsel only increased during the trial with Attorney Hughes using the bias claim as a cudgel whenever Attorney Lyons pressed Debtor on inconsistencies in his testimony. While Attorney Lyons' questioning about Debtor's personal medical history was inappropriate, the Court does not believe that he displayed bias against Debtor in the prosecution of the Second Amended Complaint.

34